UNITED STATES of America

v.

Stephen **MESAROSH**, also Known as Steve Nelson, William Albertson, Benjamin Lowell Careathers, James Hulse Dolsen and Irving Weissman, Appellants.

Nos. 11169–11173.

United States Court of Appeals Third Circuit.

Argued June 9, 1954.

Decided June 13, 1955.

Rehearing Denied Aug. 11, 1955.

Thomas D. McBride, Philadelphia, Pa., Frank J. Donner, New York City, Ralph E. Powe, Philadelphia, Pa., for appellants.

D. Malcolm Anderson, Asst. U. S. Atty., Pittsburgh, Pa. (John W. McIlvaine, U. S. Atty., Pittsburgh, Pa., William G. Hundley, Francis L. Williamson, Lawrence K. Bailey, Attorneys, Department of Justice, Washington, D. C., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

These are appeals from judgments of conviction entered against the appellants, Stephen Mesarosh (also known as Steve Nelson), William Albertson, Benjamin Lowell Careathers, James Hulse Dolsen, and Irving Weissman, after a jury had found them guilty of conspiring to unlawfully, wilfully and knowingly advocate and teach the duty and necessity of overthrowing and destroying the Government of the United States by force and violence, with the intent of causing the aforesaid overthrow and destruction of the Government of the United States by force and violence as speedily as circumstances would permit.[1]

The appellants raise numerous objections to the judgments of conviction. Some of the objections are similar to those passed upon by other federal courts in cases commonly known as Smith Act cases.[2] Other objections are unique to this Smith Act prosecution, though by no means novel to the law. For reasons which follow, we have concluded after examination of the alleged errors that the judgments of conviction should be affirmed.

First, the appellants contend that the question of guilt should not have been submitted to the jury because sufficient evidence of certain essential elements in the prosecution's case was lacking. Specifically, it is urged that the evidence did not warrant jury conclusions that an agreement for illegal purposes existed among the appellants, nor that each appellant possessed the necessary illegal intent.

The government contended that the appellants as national, district, and state functionaries of the Communist Party agreed to teach and advocate the Marxist-Leninist doctrines, which doctrines, according to the government, called for the violent and forceful overthrow of the government as speedily as circumstances would permit. Certainly, there was sufficient evidence that the purpose of the reconstituted Communist Party in 1945 was to return to the fundamental principles of Marxism-Leninism. So much was admitted by one of the defense witnesses. Whether the agreement to teach Marxism-Leninism was in fact an agreement to teach the violent and forceful overthrow of the government was the point in issue, and on this the evidence was more than sufficient.

A former Communist Party functionary on the national and state levels testified that a return to the fundamental principles of Marxism-Leninism really meant a return to teaching and advocating the forceful and violent overthrow of the government. The prosecution in-

---

1. The indictment was brought under two statutes because of a revision in the Federal Criminal Code. The conspiracy is charged under Section 3 of the Smith Act, 18 U.S.C. § 11 (1940 ed.) while said section of said Act remained effective; thereafter, the conspiracy is charged under 18 U.S.C. § 371 (1952 ed.), the general conspiracy statute.

2. See Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; United States v. Flynn, 2 Cir., 1954, 216 F.2d 354, certiorari denied, 1955, 348 U.S. 909, 75 S.Ct. 295; Frankfeld v. United States, 4 Cir., 1952, 198 F.2d 679, certiorari denied, 1953, 344 U.S. 922, 73 S.Ct. 389, 97 L.Ed. 710; United States v. Dennis, 2 Cir., 1950, 183 F.2d 201; Yates v. United States, 9 Cir., 225 F.2d 146.

troduced numerous passages from pamphlets and books used by the Communist Party to show that the fundamental principles of Marxism-Leninism included as a sine qua non to the proletarian revolution a forceful and violent overthrow of the United States Government. It is to be emphasized that the pamphlets and books introduced by the prosecution were not found in the ancient relic room of some public library. They were documents being used and distributed by Party members, including appellants, for instruction in Party classes. In addition, witnesses testified to declarations and Party classroom instructions by the defendants and others which supported the view that their advocacy of Marxism-Leninism included the violent overthrow of the government.

The evidence showed that the Marxist-Leninist doctrines considered certain principles of organization and action essential before a Party could hope to be successful in staging the proletarian revolution by force and violence. It was shown that the Communist Party of the United States utilized these basic techniques and principles. Democratic centralism by which strict discipline was maintained among Party members was the cornerstone of Party organization. The Party concentrated much of its activity among workers in key industries. Plans for underground operations by the Party were prepared and steps taken to implement such plans. The appellants would have us believe that these elements are really innocent of any connection with overthrow of the government by force and violence. But there was evidence that the laying of this groundwork was considered in Party literature as essential to successful forceful overthrow. The jury was quite justified in finding that, as the alleged Party conspirators were actively participating in the group which implemented and gave effect to these very teachings, their purpose and intent was actually the forceful overthrow of the government, rather than the academic discussion of devitalized Communist principles.

Ample evidence likewise existed to establish the necessary intent of each appellant. The appellants all held positions of rank in the Party at national, state, or district levels, and the testimony presented showed them to be most active leaders, instructors, and organizers, at times on practically a full-time basis in Party activities.

Evidence of these numerous roles as active Party leaders without more would have been sufficient to attribute to each defendant a full knowledge of the Party's purpose to bring about the forceful and violent overthrow of the government. But, in addition, as to each appellant there was evidence of declarations that would sustain a conclusion that they believed and taught that violent revolution was necessary to effect their purposes. At least three of them were quoted as declaring that force and violence were necessary to achieve success. Another in 1950 declared that the Communist Party gained control of youth in the Soviet Union before being able to wage the successful revolution of 1917, and so the Party had to gain control of youth in the United States in order to wage a successful struggle. The fifth spoke of the necessity of sabotage and its use to knock out specific key plants when the time came. These various declarations, combined with appellants' Party activity, more than sufficed as evidence of each appellant's illegal intent. They were not convicted because of membership or the holding of Party office per se, so that there was no violation of Section 4(f) of the Subversive Activities Control Act of 1950, 50 U.S.C.A. § 783 (f). Their guilt was shown to be personal and individual and not imputed merely on the basis of associations, membership, or official title. What was said by Judge Harlan (now Justice Harlan) in United States v. Flynn, 2 Cir., 1954, 216 F.2d 354, 360, is applicable to this case:

"It is indeed true, as the appellants assert, that under criminal statutes involving proof of a specific intent a person may not be convicted

simply on the basis of an 'imputed' intent. He himself must be shown to have had the requisite intent. But it does not follow from this that proof of such an intent is limited to that particular person's own acts and declarations, whether the prosecution be for a substantive crime or for the crime of conspiracy. For, as Justice Jackson said in Cramer v. United States, 1945, 325 U.S. 1, 32–33, 65 S.Ct. 918, 934 [89 L.Ed. 1441]: 'Actions of the accused are set in time and place in many relationships. Environment illuminates the meaning of acts, as context does that of words. What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others, the interchange between him and another, the give and take of the situation.' So here, the relationships of the defendants and of others acting in concert with them; one with another, the defendants' positions of responsibility in the Communist Party, their activities in carrying forward the objectives of the party, and the nature of those objectives were all matters properly to be considered upon the 'intent' of any particular defendant. And the declarations of other co-conspirators, in furtherance of the conspiracy and within its purview, stand on no different footing. To permit such declarations to be considered on the issue of the 'intent' of a particular defendant, a *prima facie* case of conspiracy among the appellants and others having been made out, was not to impute to such defendant the intent of others, but was simply to include such declarations among the circumstances which the jury might consider in determining the individual intent of that particular defendant. This was entirely proper. 'Intent' as well as any other element of a crime may be proved by circumstantial evidence.

United States v. Pierce, D.C.1917, 245 F. 878, affirmed, 1920, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542; Nosowitz v. United States, 2 Cir., 1922, 282 F. 575. And the rule admitting acts and declarations of co-conspirators in furtherance of the conspiracy against all defendants applies equally to motive and intent as to other issues. See Wiborg v. United States, 1896, 163 U.S. 632, 658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Pinkerton v. United States, 1946, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489.''

■ Though some of the declarations were pre-1945, the evidence was nonetheless relevant and significant as to intent. Acts and declarations by appellants prior to the indictment period were significant in determining intent. See United States v. Dennis, 183 F.2d at page 231.

In discussing the sufficiency of the evidence, we have assumed that all evidence was properly before the jury. Appellants, however, contend that certain evidence should not have been admitted.

The indictment charged that on or about April 1, 1945, and thereafter the appellants, along with other named individuals and divers other persons unknown, conspired to teach and advocate the violent and forceful overthrow of the United States Government, and that as part of said conspiracy the appellants and co-conspirators were to become members, officers and functionaries of the Communist Party knowing the purpose of the Party and were to assume responsibility for carrying out its plans and activities. The appellants use the 1945 date as the split-off point for their objections.

■ Certain evidence of acts and declarations prior to 1945 was admitted against all appellants to show the illegal purposes of the Communist Party. The purposes of the Party prior to 1945 were considered relevant on the basis that the aims and purposes of the Party prior to 1945 were the same as the post-1945 pe-

riod. Accordingly, the judge charged the jury, "At this point I instruct you that if you are not satisfied with the proof that the aims and objectives of the Communist Party after July, 1945, were the same as before 1944, then you should disregard all the evidence having to do with facts and events which took place before 1944, and the declarations and statements which were made by alleged co-conspirators before 1944, and decide the case on the evidence dealing with facts which occurred after April 1, 1945. In this event, you may, however, consider the acts done and statements made by each defendant prior to 1945 as bearing and reflecting solely upon the intent of that defendant, if you find he became or remained a member of the alleged conspiracy after April, 1945, with knowledge of the alleged criminal purposes of the conspiracy."

The evidence of identity of Party purposes before 1945 with the purposes after 1945 was relevant because there was sufficient evidence for the jury to conclude that the conspiracy charged in the indictment was an uninterrupted continuation of a conspiracy which had been in existence for some time. Indeed, this identity of purposes and teachings, along with the fact that many of the same individuals were active and influential in both the pre-1945 Party and the reconstituted Party after 1945, was itself evidence that the conspiracy was a continuing one which never changed its prime objective. But the identity of purposes was also relevant even if, as appellants contend, the conspiracy was interrupted during the brief existence of the Communist Political Association because the evidence clearly showed the purposes of the reconstituted Communist Party in 1945 to be the same as prior purposes of the Party before the interruption by the Communist Political Association. The Communist Political Association was considered "in error," having abandoned the "basic principles" of Marxism-Leninism, and the reconstituted Party was to guarantee "the re-establishment of the Marxist content of its program, policies

and activities." There was abundant evidence that the reconstituted Party was to have the identical purposes that the earlier Communist Party had. On either the continuing conspiracy theory or the return to basic doctrine theory, the evidence was relevant and sufficient, and the jury could have properly considered the pre-1945 evidence in line with the court's charge.

■ The appellants contend that much of the pre-1945 evidence violates the hearsay rule. But the hearsay bar has no application to the specific items of evidence to which the appellants refer. The evidence of prior acts and declarations was not admitted as probative of the truth of the declarations. Whether or not the declarations stated a truth was immaterial. The relevant fact was that the declarations were made. The material issue was the Party's purposes and teachings. Thus, to illustrate with the first objection enumerated by appellants, they cite the witness Lautner's testimony that in 1930 at a Hungarian Communist training school, one Weinstock taught that revolutions similar to the Russian revolution would take place on a world-wide scale until capitalism would be destroyed in every country and that all Communist Parties were required to accept certain conditions for admission to the Communist International. These conditions were read to the jury. Whether or not a world-wide revolution was necessary for the destruction of capitalism and whether or not the outlined conditions were really necessary were immaterial to the fact in issue. The important fact was that such was taught and advocated by Party leaders at Party schools.

■ The same is true of the objections made as to the declarations of some of the appellants. For example, the witness Mazzei testified that the appellant Dolsen in 1943 instructed a class that revolution could come about only by the violent overthrow of the government. The witness also read certain passages of a book which Dolsen had read to the class. This evidence was certainly ad-

missible against Dolsen on the question of his intent (6 Wigmore § 1788 et seq., 3d ed. 1940), but the evidence was likewise admissible to prove the objective fact of the Party's teachings, and this was not hearsay. 6 Wigmore § 1766. Nor was the pre-1945 evidence too remote to be material. The prosecution's evidence contained links in Party teachings sufficient for the jury to find a continuity of Party purposes and teachings through the 1930's up to the indictment period. The court below did limit the effect of some of the pre-1945 testimony, such as appellant Nelson's training in the Lenin School in Moscow in 1931, to the question of the particular individual's intent. Such evidence, so limited, did not, of course, violate the hearsay rule, nor was it too remote since a sufficient continuity of participation by Nelson in Party activities was shown. United States v. Dennis, 183 F.2d at pages 231–232.

■ Even had the pre-1945 evidence been hearsay, it would have been admissible. These acts and declarations which occurred before some of the appellants became members of the Party were admissible because when one joins an existing conspiracy knowing of the illegal objectives, he takes the conspiracy as it is, including prior acts and declarations by co-conspirators which are competent evidence against him. Frankfeld v. United States, 198 F.2d 679; Lefco v. United States, 3 Cir., 1934, 74 F.2d 66; Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961. Of course, the acts and declarations of co-conspirators made while appellants were all members of the Party are admissible. This same rule is applicable to appellants' objections to acts and declarations of co-conspirators made after 1945. The appellants, however, contend that before the co-conspirator rule is applicable, there must be independent evidence of their connection with the conspiracy; but such connection was not lacking in the evidence. As pointed out earlier, the evidence as to the roles appellants played in Party activities was sufficient to provide the connecting links. It is significant to note here the acknowledged (by the defense) principle of democratic centralism by which the Party functioned. Different Party groups were bound almost religiously to abiding by their leaders' decisions and instructions. The evidence of democratic centralism justified the inference that any Party leader or instructor took his orders from essentially the same sources that provided appellants with their instructions. So it was immaterial that appellants might never have known or seen some of the co-conspirators whose acts and declarations were admitted. It is nonsense to say that individuals must meet and shake hands in order to be co-conspirators. We note that the indictment charged a conspiracy by appellants, other named persons and divers other persons unknown to the grand jury.

■■ The admission of testimony by the witness Lautner (a former Communist instructor in Party classes, member of the Party's National Review Commission and New York State Review Commission) as to the meaning of the terms in the Party Constitution was not error. Wide discretion rests in the trial judge as to the admission of opinion evidence. See United States v. Dennis, 183 F.2d at page 229. Testimony similar to Lautner's was also given by defense witness Davis. The court properly allowed both to testify.

■ Next, the appellants attack the judgments because they say there was no clear and present danger of the substantive evil which is necessary to sustain their convictions. It has already been determined by the Supreme Court that a conspiracy, highly organized and widespread, with rigid discipline and well-trained members, to advocate the violent overthrow of the government is a sufficiently grave evil to justify the invasion of First Amendment rights. Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. See United States v. Flynn, 216 F.2d at pages 366–367. The conspiracy in this case was the same conspiracy charged in the Den-

**456**

nis and Flynn cases so far as advocacy is concerned.

■ The appellants have argued that the Dennis conspiracy should be considered significantly different because "these appellants were plainly not in a position of national power or policy-making" and "the agreement in the Dennis case was an agreement of a small policy-making group within the Communist Party to assume responsibility for the acts charged in the indictment." But the hierarchal rung upon which a conspirator perches is not relevant because it is the existence and nature of the conspiracy which gives rise to the danger. The activities of the ringleaders constitute a clear and present danger because the tentacles of their authority reach into all parts of the country to give direction to their subordinates, without whom the leaders would probably be helpless. In effect, the larger the conspiracy, the more likely and the more imminent the danger, and all members of that group possessing the necessary intent are equally guilty.

The only question really open to the district court after the jury verdict was the world setting in which the conspiracy thrived. As Judge Harlan said in United States v. Flynn, 216 F.2d at page 366, "Where a conspiracy to destroy the Government by force or violence is involved, we think that the 'clear and present danger' concept, as defined in Dennis, 183 F.2d at page 212, 341 U.S. at page 510, 71 S.Ct. at pages 867–868, connotes no more than that the setting in which the defendants have conspired is such as to lead reasonably to the conclusion that their teachings may result in an attempt at overthrow."

The district court knew that the Supreme Court had determined that world conditions between 1945 and 1948 (period of the Dennis indictment) were such that the conspiracy constituted the requisite danger, and, as was stated in the Flynn case, " * * * if the danger was clear and present in 1948, it can hardly be thought to have been less in 1951, when the Korean conflict was raging and our relations with the Communist World had moved from cold to hot war." 216 F.2d at page 367. The district court was concerned with world conditions during substantially the same period as that in the Flynn case, since the indictment in this case was filed about seven months after the Flynn indictment.

■ According to the appellants, the court erred in finding a clear and present danger without permitting a hearing which would have given appellants an opportunity to produce evidence that no clear and present danger existed. As we have pointed out, the only question the court had to determine was the setting in which the conspiracy thrived. Although the court was thus faced with the determination of an objective fact, there was no need for a hearing which, under the circumstances, would have been fruitless. The evidence which the appellants would have offered would have been immaterial in view of the court's undoubted knowledge of general world conditions, coupled with considerations of "similar uprisings in other countries and the touch-and-go nature of our relations with countries with whom such ideological doctrines were attuned." A court need not hear evidence on all disputed points where, as here, such hearing would be at best an idle gesture. 9 Wigmore § 2567, 3d ed. 1940.

The appellants object to the following part of the court's charge concerning the clear and present danger:

"If you find that the Government's contention with respect to the advocated use of force and violence by the Communist Party to accomplish a revolutionary change from capitalism to socialism is established to your satisfaction beyond a reasonable doubt, and that it was the intention of the party to accomplish such a revolution as speedily as circumstances will permit, that situation constitutes a clear and present danger which justifies the application of the charge of conspiracy to violate the Smith Act [18 U.S.C. § 2385]. The existence of such a

highly organized conspiracy, with rigidly disciplined members subject to call when the leaders feel that the time has become opportune for action, accompanied with the nature of world conditions, similar uprisings in other countries and the touch-and-go nature of our relations with countries with whom such ideological doctrines were attuned, constitutes a clear and present danger.

"This latter finding is a matter of law, with which you need not concern yourselves. I refer to it here, as did the Supreme Court of the United States in a recent case, to indicate to you that the provisions of the First Amendment to the Constitution with regard to the right of free speech does not of itself authorize the teaching of overthrow of the government by force and violence."

██ It is argued that the above is prejudicial because the court informed the jury of his reasons for finding that a clear and present danger existed. First, in view of the full charge, we disagree with appellants' contention that the judge was telling the jury he had already decided that there existed "a highly organized conspiracy with rigidly disciplined members subject to call when the leaders feel that the time has become opportune for action * * *." This must be read in connection with the earlier statement about the government's contention. Thus the existence of such a conspiracy as the court outlined and as the prosecution contended throughout was for the jury to determine and *if* they did, the court stated that it would be a clear and present danger in view of world conditions.

This part of the charge was later followed by a lengthy review of the evidence during which it was made quite clear to the jury that appellants denied any such conspiracy, and it was for the jury to decide the question. Nor were the statements about world conditions, etc., prejudicial. To begin with, as was pointed out above, the court mentioned items which were of such common knowledge that only a jury with an average age of two would not have been aware of them. In addition, the jury was cautioned that the "latter finding" did not concern them. Again we emphasize that a lengthy review of appellants' claims of innocence, by specifically mentioning their reasons for denying almost each government contention, was made by the court after the above-mentioned portion of the charge.

██ Appellants Weissman, Albertson and Careathers allege error in the district court's refusal to grant motions for a change of venue and for severance of their trial from appellants Nelson and Dolsen, who had previously been convicted in Pittsburgh (site of the trial in the present case) of violating state sedition laws. It is claimed that severance was necessary because there was a stigma of guilt hovering over Nelson and Dolsen as a result of the state conviction which would be transferred to the others. The argument, of course, presupposes that Nelson and Dolsen could not be given a fair trial in the federal court. For if they could, then certainly no prejudicial stigma or hostility would prevail as to them which might stain the presumption of innocence as to Weissman, Albertson and Careathers. Accordingly, we shall consider the alleged error that since none of the appellants could secure a fair trial in the Western District of Pennsylvania, a change of venue for all should have been granted. The verdict against Dolsen in the state court occurred fourteen months before the jury selection in the first federal trial began and the verdict against Nelson nine months earlier. There was a mistrial, however, because of the trial judge's death, and the case began anew. When the selection of the jury began, in the new trial from which this appeal is taken, over seventeen months had elapsed since the Dolsen state verdict and over a year since the Nelson verdict. According to the appellants, however, an impartial jury could not have been obtained. They cite numerous examples, attempting to show that community hostility to some of the appellants was rampant.

Some of the incidents to which the appellants allude occurred two, three, or almost four years before the trial and did not have any direct connection with the trial. As examples, the breaking up by mob violence of an attempted Party meeting in Western Pennsylvania on behalf of Communist leaders on trial in New York occurred in 1949. The motion picture, "I Was a Communist for the F.B.I.," based on the activities of Cvetic, one of the witnesses at the trial, premiered in Pittsburgh with much fanfare over seventeen months before the jury selection in this trial. The appellants cite the tremendous amount of publicity, through newspapers, radio and television, given to their activities and to the charges against them, particularly as to Nelson, and point out that this had been going on for a long period of time. But though this publicity was widespread and continuing, it was no different than the type accorded to all those who make the news. There is no indication here of a convict-or-else campaign by the various media of publicity; no evidence of unconditional demand that these appellants be convicted and jailed. The facts here do not approach those present in Shepherd v. Florida, 1951, 341 U.S. 50, 51–53, 71 S.Ct. 549, 95 L.Ed. 740, from which guiding principles have been quoted by the appellants in their brief. Contrary to the appellants' contention, there is no reason to believe that the general community feeling about Communism in the Pittsburgh area was significantly different from that which may have permeated the entire country. Any such general community attitudes are not sufficient reason to believe that an impartial jury cannot be obtained. United States v. Dennis, 183 F.2d at page 226.

There was no abuse of discretion by the district court in denying a change of venue.

During a temporary suspension of the trial in June, 1953, Mazzei, who was a former agent for the F.B.I. and was a witness for the government in this case, testified in Washington before the Senate Permanent Sub-Committee on Investigations, headed by Senator Joseph R. McCarthy. Appellants asked the trial court for a mistrial because of the publicity which Mazzei's testimony received in the Pittsburgh area which they claimed made a fair trial impossible.

The publicity which Mazzei's testimony received centered primarily upon an alleged assassination plot by the Communist Party against Senator McCarthy. Although some of the publicity in the Pittsburgh area made references to the Western Pennsylvania Communist Party and even to some of the appellants, there was no occasion for declaring a mistrial.

Each of the jurors was questioned individually and alone by the court about his knowledge of the incident either by his own reading or in discussion with others. After the inquiry, during which each juror was put under oath, the court concluded that the jurors had not been influenced by the publicity.[3]

The appellants rely heavily upon Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, but the differences between the situation in that case and the one presented here is quite obvious and significant. In Delaney, there was a Congressional hearing after indictment but

---

3. During the court's inquiry, the jurors were asked if they had read about or discussed the hearing before Senator McCarthy in which Joseph Mazzei testified. It is interesting to note that although it is claimed that the publicity was such that the jury could not have helped being influenced, appellants did not think the judge's reference to Senator McCarthy's hearing and to Joseph Mazzei's testimony was complete enough for the jury members to know what he was talking about during the interrogation. They wanted the judge to mention the assassination plot against Senator McCarthy. This, of course, was what received the great publicity. The judge refused and, we think, correctly to include that element in his questioning. Certainly, even had the jurors read the articles, if prejudice was created in relation to appellants' trial, they would have known to what the judge was referring without his mentioning assassination.

before trial which was directed specifically at the defendant and his allegedly illegal activities for which he had been indicted. Here, the hearing did not specifically concern the appellants' trial or their alleged illegal activities, and the resulting publicity was only incidentally connected with the trial. It occurred after a jury had been selected and cautioned not to read about or discuss the case with anyone. We find no error in the denial of the motion for a new trial. See United States v. Griffin, 3 Cir., 1949, 176 F.2d 727, 731.

Appellants raise other questions. The constitutional arguments interspersed in their brief present no new problems and have been foreclosed by the Supreme Court's decision in the Dennis case. Likewise, we have examined other questions raised, including the withdrawal of a defense attorney due to illness in the closing days of the trial and the refusal of the court to dismiss the indictment completely after striking a portion thereof. We find no merit to these or any of the other questions.

Appellants' contentions concerning the methods of compiling the jury lists and the resulting make-up of the jury in the Western District of Pennsylvania are fully covered by our opinion in Dow v. Carnegie-Illinois Steel Corporation, 3 Cir., 224 F.2d 414.

Appellants were duly convicted after a long trial, presided over by Judge Marsh. A reading of the transcript indicates that the trial was firmly but fairly conducted. During the trial the court scrupulously and efficiently attended to his task of protecting the defendants' rights to which the presumption of innocence entitled them. There is no reason to disturb the judgments of conviction which will be affirmed.

HASTIE, Circuit Judge (dissenting).

Comment on two important general considerations prefaces this dissenting opinion.

Judges are likely to be thoughtful, patriotic and well informed citizens who over the years have read, heard and observed much about the world wide organization of the Communist party and its activities. Therefore, they cannot escape serious apprehension, or even strong personal conviction, that policies and practices both hostile and dangerous to our institutions are promoted by that organization. Jurors too are likely to share these apprehensions and convictions. Moreover, we do not and should not apologize that our ethical notions, religious convictions and political views of the type of social order that is decent and rewarding to its members, all combine to make the totalitarian Communist state as it functions in much of the world today odious and frightful in our sight.

These facts of life are stated at the outset because they add greatly to the difficulty of deciding such a case as we have here. The defendants are Communists. They are charged with conspiracy to teach and persuade people that they should engage in violent insurrection against our government as speedily as circumstances may permit. The record is very long and its analysis is a tedious and unwelcome task. In such circumstances it is very difficult to evaluate thousands of pages of testimony and exhibits without somewhere along the line permitting the thought that these defendants are an undeserving lot, and likely to have done the things with which they are charged, to distort judgment of the probative value of the evidence, or even to take the place of evidence on some important issue. Indeed, there is a very clear indication that this has already happened. The record shows that during the trial the prosecutor candidly stated in open court that "at this particular time, we do not contend that there is any question of the personal guilt of any of the defendants involved here, except with the possible exception of Mr. Nelson [Mesarosh]. * * *" Although the opinion of this court takes the position that the prosecutor's case was not as weak as he thought, I think the quoted admission accurately reflected the state of the record throughout the trial. In any event, it is difficult to believe that

persons trying to be fair, as the jurors here undoubtedly were, would have been willing to send anyone but a Communist to jail after hearing such an admission by the government that the personal guilt of the accused was not established.

My second preliminary observation is this. Our responsibility as a Court of Appeals is magnified by the often-stated reluctance of the Supreme Court to review the adequacy of proof which has satisfied both a trial court and a Court of Appeals. Indeed, in the one recently reviewed case of this very type the Supreme Court refused to consider the sufficiency of the evidence to sustain the conviction. Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 871, 95 L.Ed. 1137. Thus, this court may well be the only appellate tribunal which will consider whether the evidence against these defendants meets the high standard of proof our law imposes in all criminal cases.

We come now to the particulars of this case. The defendants have been convicted under the Smith Act of conspiring to teach and persuade people that they should bring about the overthrow of the existing government of the United States as soon as possible and that violent means must be employed to that end.

In his charge to the jury, the trial judge made a clear, detailed and accurate statement of what the prosecution had to prove to establish the defendants' guilt:

"In order to find any of the defendants guilty of the alleged conspiracy to violate the Smith Act, the evidence must satisfy you beyond a reasonable doubt that the following elements have been proved: First, that the conspiracy to teach and advocate the duty and necessity of overthrowing or destroying the government was conceived by certain conspirators, and continued to function within the three-year period prior to the finding of the indictment; second, with respect to each defendant individually and separately considered, that he knowingly and wilfully was a member of that conspiracy during its existence, with knowledge of its unlawful purpose, and with the intent that such teaching and advocacy be a rule or principle of action, and with language reasonably and ordinarily calculated to incite persons to such action; third, that a defendant, while a member of the conspiracy, had the specific intent to cause or bring about the overthrow or destruction of the government of the United States by force and violence as speedily as circumstances would permit; fourth, that thereafter at least one overt act as charged was knowingly committed by one of the conspirators within the period of the statute of limitations, that is, within the three-year period from January 18, 1949, to January 18, 1952; fifth, that such overt act was committed in furtherance of an object or purpose of the conspiracy; * * *."

My study of the record has convinced me that on certain of the issues thus stated there was no such proof as would warrant submission of the case to the jury. Therefore, the defendants were entitled to directed verdicts of acquittal.

# I

It is basic and inescapable datum of this case, that the defendants were indicted and convicted for conspiracy to engage in dangerous talk and indoctrination, and nothing more than that. It has not been charged, much less proved, that they have joined a conspiracy to overthrow our government. It is not even contended that their plan or scheme which, the government says, was adopted in 1945, matured into or was evidenced by any illegal teaching or advocacy during the three years—the period of the statute of limitations—immediately preceding the 1952 presentment of the present indictment.

The difficulty of squaring such punishment of talk or planning to talk with the prohibition of the First Amendment is immediately apparent. Were the matter

one of first impression, we would face a difficult question whether consistent with the prohibition of this Amendment Congress could, without unlawful abridgment of free speech, make criminal such a scheme to organize and carry out a campaign of dangerous talk. But the Supreme Court has wrestled with this problem and concluded that within stated narrow limits such talk may be punished, the First Amendment notwithstanding. Dennis v. United States, supra. However, the fact remains that generally talk hostile to the government is the very sort of thing the First Amendment removes from Congressional power to proscribe. Therefore, the narrow limits which define punishable talk, as the Supreme Court has staked them out in the Dennis case, must be regarded as of utmost importance. They are not mere formalities. They are essentials which must be clearly proved to save any conviction of planning or indulging in dangerous talk from the prohibition of the First Amendment.

Of special concern here is the Supreme Court's limitation of its Dennis decision to situations in which it is established as a fact that the actual or contemplated verbal conduct is calculated to incite men to violence as soon as circumstances will permit. In the leading opinion in the Dennis case, Chief Justice Vinson stressed the fact that the jury must have found, pursuant to appropriate instructions, that advocacy was directed toward violent action "as speedily as the circumstances would permit." It seems to have been his view that this much proximity was necessary to satisfy the clear and present danger test, which he recognized as a measure of constitutional limitation on Congressional power in this kind of case. It was the threat of violent action at first opportunity which he regarded as so imminently dangerous that Congress could make advocacy so directed a crime. To that extent validity remains in Professor Chafee's often quoted formulation: "The real issue in every free speech controversy is this: whether the state may punish all words which have some tendency however remote, to bring

about acts in violation of law, or only words which directly incite to acts in violation of law." Free Speech in the United States, 1941, 23. Compare the observation of Professor Goodrich, now a member of this court: "This is very important; the liability is not to be found in the general effect of the words, nor in what may be thought to be their dangerous tendency. Indeed, the test is similar to the common law liability for attempt to commit a crime—the act done by the wrongdoer must have come dangerously near to success." Goodrich, Does the Constitution Protect Free Speech?, 1921, 19 Mich.L.Rev. 487, 492, 2 Select Essays on Constitutional Law, 1938, 1068, 1072.

Mr. Justice Frankfurter's opinion also noted the importance of the finding that the scheme of the defendants was to incite to violent action as soon as feasible. He cites a clearly punishable plot to overthrow the government as one extreme and "a seminar in political theory" as the other, with the Dennis scheme somewhere in between. Apparently, what made the Dennis scheme punishable like a treasonable conspiracy rather than permissible like political indoctrination was this design to bring about violent action as soon as circumstances would permit. A Marxist group may lawfully attempt to persuade people to believe unreservedly that the writings of Marx and Lenin and similar dogma constitute the only acceptable guide to struggle for a desirable kind of society. This must be coupled with some call to unlawful action against the government to make the conduct punishable. But a call to action in the indefinite future is a meaningless contradiction of terms. Some meaningful orientation in time, whether by specification of the time when action is to be taken or otherwise, is an essential part of every call to action. Thus, the government has found it necessary here, as in the Dennis case, to charge a design to cause violent action as soon as circumstances will permit, in order to establish requisite incitation beyond indoctrination with revolutionary politi-

cal theory. The trial judge properly stated and emphasized this requirement in his above-quoted instructions to the jury.

Such are the considerations which define the essential and restrictive frame of reference in relation to which the evidence must be evaluated.

The indictment charged and the prosecution undertook to prove the particular time and circumstances of the beginning of the alleged conspiracy. The indictment charged that "from on or about April 1, 1945 and continuously thereafter * * * the defendants * * * did conspire" to engage in advocacy of insurrectionary action proscribed by the Smith Act. It was the government's theory that early in 1945 there occurred a demonstrable basic change in the policy and program of the organized American Communists. The prosecution showed that during a period which continued through 1944 and into 1945, the American Communists carried out a policy and program of attempting to achieve the political, social, and economic changes they desired within the framework of our polity and by constitutional and lawful means. In charging the jury the court recognized this state of the record, saying that the "prosecution claims to have proved that during World War II, the objectives of the party were revised * * * and that a plan of cooperation between the working classes and the other classes, called the bourgeoisie, was adopted * * *."

But in 1945, a Reconstituting Convention eschewed the "deviations" of the past and undertook to reorganize and reorient the American Communists under the lately abandoned Communist Party name and with the avowed design of strict adherence to "Marxism-Leninism". The prosecution undertook to prove that this was the beginning of the conspiracy to advocate the violent overthrow of our government with which defendants are charged.

The prosecution first introduced the text of certain speeches and resolutions of the 1945 Communist convention together with the resultant new constitution of the Communist Party. These were presented by the government as the overt manifestation and authoritative statement of the conspiratorial agreement. But, as the government has recognized throughout this case, these statements and documents do not on their face sanction the violent overthrow of the existing government much less call for work toward its achievement as soon as possible. Contrariwise, the new party constitution states that the "Communist Party upholds the achievements of American democracy and defends the United States Constitution and its Bill of Rights." The preamble extols American democracy and one of the subsequent articles calls for the disciplining of members who participate in any activities to undermine or weaken our basic American institutions.

Beyond this the prosecution, after showing that William Z. Foster was the dominant figure in the convention, put in evidence his explanation of the new party line in the following report to the convention:

"The fourth and last false conception that I wish to speak against is the idea being circulated by 'Left' sectarian voices in our Party to the effect that the present program of the Party is only transitory, that we are on our way to a much more Left interpretation of the present national and world situation. According to these comrades, we are going to, or should, denounce the war against Japan as imperialist, condemn the decisions of Teheran as unachievable, drop the slogan of national unity, call for a farmer-labor government, give up our wartime no-strike pledge, abandon the fight for 60,000,000 jobs, bring forward the question of socialism as an immediate issue, and generally adopt a class-against-class policy.

"But these comrades are indulging in wishful thinking. Our Party, if I know it, is not going to take any such Leftist course. For the

Party, in its overwhelming majority, understands that Leftist policies of this character would be no less disastrous to us than Browder's Right revisionism. The line of the National Committee's Resolution is the correct one; in its analysis, its formulation of immediate demands, and its placing of the question of socialism. We must hew to the line of that Resolution, taking into account, of course, necessary amendments. We are not getting rid of Browder's Right opportunism to fall into a swamp of 'Left' sectarianism."

After thus putting in evidence the new policy and position of the reconstituted Communist Party as openly stated in terms of adherence to American institutions, the prosecution undertook to show that all of this had a sinister meaning, not obvious on its face. The key, it is said, to the real intendment is to be found not in the above-quoted specific averments of policy but in the announced general purpose—which the defendants admit—to eschew recent "deviations" from classical Marxist doctrine and to follow "basic Communist principles of scientific socialism". In the reconstituting papers this revised "line" was called "Marxism-Leninism." Accordingly, the prosecution undertook to establish the meaning of this phrase through a former Communist named Lautner.

This witness then testified that on the basis of his experience as a member of the Communist Party for 20 years it was his opinion that the use of the expression "Marxism-Leninism" in the 1945 party constitution implied a sanction of the violent overthrow of capitalist government inconsistent with the avowals of respect for American institutions which appear elsewhere in the 1945 constitution and the proceedings of the 1945 convention. When asked his opinion of the provision in the constitution for expulsion of persons who should attempt to overthrow the American institutions of majority rule, he said that "it is a self serving declaration". He made no com-

ment on Foster's explanation of the new "line".

But, more important, in the light of the legal requirement that a punishable scheme must have been directed toward violence as soon as feasible, Lautner's opinion was given merely in terms of a generalized revolutionary goal of the Communist group. Its inadequacy is highlighted by another excerpt from the trial charge, reemphasizing the point we are considering:

"The intent required is not merely the intentional advocacy or teaching of the overthrow and destruction of the government of the United States by force and violence. The Government must prove beyond a reasonable doubt that each defendant, in addition, had the further specific intent to accomplish the overthrow of the government of the United States by force and violence as speedily as circumstances would permit. Such further and additional intent must be clearly and plainly proven beyond a reasonable doubt, and can not be inferred simply from advocacy of the overthrow of the government of the United States by force and violence, if there was such advocacy."

If this court accepts that formulation as a correct statement of law, it seems very clear that the prosecution did not prove its case.

Lautner did not point to a single thing indicating that the 1945 program contemplated, beyond inculcation of belief in and approval of an ultimate revolution, teaching that the time had now come to work for the overthrow of the existing government as soon as possible. It has already been pointed out, but will bear restatement, that this distinction is of basic importance in all constitutional theory of restrictions on utterance permissible under the First Amendment. The line which the courts try to draw distinguishes punishable incitation to insurrectionary action from permissible teaching that at some time in the future

violence is inevitable and the "proletariat" must be ready for it. Lautner's testimony does not even make clear whether there is anything in the 1945 program which in his view implies one rather than the other. He did say "I consider myself an expert on the basic aims and objectives of the Marxist-Leninist principles, but I do not consider myself an expert on the twists and turns and tactical innovations from time to time of the Communist Parties". It is these very "twists and turns and tactical innovations" which create a serious difficulty here. For it is not a sufficient basis for proscription that the Communists are committed to ultimate violent revolutionary action. If their present tactic is a waiting game, characterized by the teaching of revolutionary theory while incitation to action is left for the indefinite future, the First Amendment prevents the government from proscribing their teaching. Our lawful recourse during such a period lies in the field of education and demonstration which will increase devotion to our democratic institutions and thus frustrate Communist preachments. There is some risk in such a course. But the adoption of the First Amendment has committed us to it.

If Lautner did not indicate any proximity of the violence against government said to be contemplated by the 1945 program, I have not found such evidence elsewhere in the record. It is noteworthy that this court's analysis of the evidence points to nothing which indicates that the Communist teaching, actual or projected, since 1945 has been calculated to incite people to violent aggression against our government as soon as feasible or within any period of time, however defined. This time element, so important in our First Amendment context, is not mentioned in the court's analysis of the record. This court, like the government during the trial, has concentrated attention upon Marxist literature and pronouncements used in Communist teaching and propaganda activities during the 1920's and 1930's. But the whole thrust of this showing is directed at establishing, with the aid of the connecting link supplied by Lautner, that approval and advocacy of proletarian revolution are present in current Communist doctrine. There is nothing to show that under the 1945 program people were urged or to be urged to accelerate the revolution by seizing the first opportunity for violence against the government.

The jury was properly charged that it could convict only if the conspiratorial scheme was "to accomplish the overthrow of the government of the United States by force and violence as speedily as circumstances would permit." I think it could have reached that conclusion only by speculation or by assumption *de hors* the record.

**II**

This indictment was returned in January 1952. The period of the statute of limitations is three years. Therefore, some conduct in furtherance of the conspiracy had to be alleged and proved to have occurred since January 1949, in order to establish that the conspiracy persisted and that defendants adhered to it during the period covered by the indictment. It will be remembered that this was one of the points upon which the charge of the trial judge was very explicit: "[the evidence must establish that] at least one overt act as charged was knowingly committed by one of the conspirators within the period of the statute of limitations, that is, within the three-year period from January 18, 1949, to January 18, 1952; fifth, that such overt act was committed in furtherance of an object or purpose of the conspiracy; * * *." An examination of the indictment shows that several overt acts were charged as proof that the conspiracy existed after January 1949. Each of these acts is the participation of one or more of the defendants in a Communist Party meeting, nothing more. It is not shown that in 1949 or thereafter a defendant or any alleged co-conspirator said or did anything advocating insurrection or even making arrangements for such advocacy. Nor does it appear that

anyone else at any of these meetings was guilty of such conduct. All that appears is that each meeting was a Communist gathering involving some discussion or planning of miscellaneous party business. This included such matters as discussion of new contacts, financing, enlarging membership, particularly among miners and industrial workers, solving internal difficulties such as those caused by the arrest of leaders, and selecting delegates for other meetings.

The failure of the prosecution to try to show how any of this conduct was in furtherance of the conspiracy charged is very revealing. If the purchase of a gun by one charged as a member of a conspiracy to commit armed robbery should be relied upon as an overt act, the prosecution would certainly try to show, and consider it vital to show, that this weapon was procured for use in the contemplated robbery. The jury may not be left to speculate in the absence of proof whether an act, innocent on its face, is in furtherance of a conspiracy. There must be evidence which, if credited, shows that design. But here the theory seems to have been that affirmative showing of connection between the 1945 conspiracy and some later action taken within the statutory period was not required. The government seems to have reasoned that any participation in a Communist meeting in such a way that the participant knowingly joined in the internal affairs of the organization became, without further showing, an act in furtherance of the conspiracy charged. But this means that the government must change its ground. It is in the position of having to claim that the Communist Party itself is the conspiracy charged. Only on that theory are Communist meetings in themselves and the attendance of defendants evidence of a continuing conspiracy and their participation. An indictment on that theory might be possible under another section of the statute. But no such charge is made here and we, therefore, have no reason to consider its involvements.

There is one other not improbable explanation of the failure of the prosecution even to try to connect the acts charged and proved after 1948 with advocacy of the violent overthrow of government. The indictment contained a second charge not heretofore mentioned. That was a charge of conspiring to organize the Communist Party as a means of bringing about the violent overthrow of the existing government. But, rightly or wrongly, the trial judge took this aspect of the indictment away from the jury, and we are not in position to review that action. It may well have been that the prosecution had regarded these meetings in 1949 and thereafter as "overt acts" of "organization" of the Communist Party, particularly since they dealt with problems of finance, membership, delegates to conventions and the like. This would explain the failure to show that these meetings dealt in some way with the advocacy of violence against the government, but would not save the government's case on the particular conspiracy submitted to the jury from the consequences of that failure. Cf. De-Jonge v. Oregon, 1937, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278.

Therefore, the failure of the government to allege and prove acts showing a conspiracy persisting with defendants' adherence after January 1949, is a second fatal deficiency of the case presented by this record.

The disposition to relax requirements of strict proof in trials of suspected subversives appears whenever the existing order is subjected to stress and strain. It is reported that in 1603, when Sir Walter Raleigh was tried by the king's judges for treason, his demand for stricter proof was silenced by the court with the withering rejoinder:

"I marvel, Sir Walter, that you being of such experience and wit, should stand on this point; for so many horse-stealers may escape if they may not be condemned without witnesses." Rex v. Raleigh, 2 State Trials (Howell ed.) 1.

In due course the accused was convicted and executed.

It may well be today that a number of Communists, among them schemers for our undoing and destruction, will go unpunished if in their cases we insist upon clear and convincing proof in open court of every element of the alleged crime. There is no gainsaying that "horse-stealers [and worse] may escape". But that is not too great a price to pay for assurance that our way of administering the criminal law minimizes for everyone the risk of undeserved conviction of crime.

In that spirit, and for the reasons stated in this opinion, I would reverse these convictions.

I am authorized to state that Judge MARIS concurs in this dissenting opinion.