## VAN HUSS v. UNITED STATES.
### No. 4418.

United States Court of Appeals
Tenth Circuit.
May 10, 1952.

A. L. Zinn, Santa Fe, N. M., for appellant.

Maurice Sanchez, U. S. Atty., and Edward E. Triviz, Asst. U. S. Atty., Albuquerque, N. M., for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

James Edward Van Huss, together with Harden Collins Kemper, Homer Taylor McGarrity, and seven other defendants, was indicted and charged in the United States District Court of New Mexico, with having conspired to transport motor vehicles in interstate commerce, knowing the same to have been stolen, and with receiving, concealing, storing, selling and disposing of such vehicles in interstate commerce, knowing that the said vehicles had been previously stolen, in violation of 18 U.S.C.A. §§ 2312, 2313. In furtherance of such conspiracy, it is alleged that the defendant Kemper made a trip from Carlsbad, New Mexico, to Brownwood, Texas, for the purpose of contacting the defendants McGarrity and Van Huss; that after such contact Van Huss on specified dates delivered automobile title papers to Kemper, and that thereafter other named defendants transported in interstate commerce specifically described automobiles, knowing the same to have been stolen. This is an appeal by Van Huss from a judgment and sentence, imposed upon a jury verdict of guilty, and the sole question presented is the sufficiency of the evidence to support the verdict.

Appellant concedes, as he must under the evidence, the sale of titles to burned or wrecked cars to one of the conspirators, but contends that the sale of such titles, even with knowledge that the same "may" be used in a scheme or design to steal automobiles and transport them in interstate commerce, does not "ipso facto" make him a member of such unlawful scheme.

It is true "that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowl-

edge the buyer will use the goods illegally." Direct Sales Co. v. United States, 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674; United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; Bartoli v. United States, 4 Cir., 192 F.2d 130; Estep v. United States, 10 Cir., 140 F.2d 40; Bacon v. United States, 10 Cir., 127 F.2d 985. But, proof of a conspiracy, by its very nature, must be circumstantial, and the step between innocent knowledge and guilty intent and agreement may be, and is usually shown by prolonged and interested cooperation, indicating a "stake in the venture". Direct Sales Co. v. United States, supra. See also, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Calderon v. United States, 10 Cir., 1952, 196 F.2d 554; Briggs v. United States, 10 Cir., 176 F.2d 317; Heald v. United States, 10 Cir., 175 F.2d 878; Bartlett v. United States, 10 Cir., 166 F.2d 920. Thus, the narrow question here, is whether the evidence developed a course of conduct or other relevant facts, from which the jury could infer beyond doubt that appellant knew of the conspiracy to transport stolen cars in interstate commerce, and with such knowledge actively contributed his efforts toward effecting the unlawful enterprise.

The decisive facts developed by the evidence are as follows: In the early part of July, 1950, Kemper, an admitted member of the conspiracy, was employed as a mechanic in an automobile agency in Carlsbad, New Mexico. He had observed a "car stealing operation" in Reno, Nevada, and thought he would "try it himself." He needed to obtain incidents of title from junked cars, which under the plan were to be transferred to stolen cars. On July 3, 1950, he left Carlsbad for Brownwood, Texas, to contact Taylor McGarrity, an acquaintance, who he thought "could do some good." Upon arrival in Brownwood, he told McGarrity that if he, Kemper, could "buy titles on junked cars, with the title complete" he "could have cars stolen or steal them himself, change the numbers and resell the car." McGarrity did not know of any source of titles, but told Kemper he would let him know in about one week.

Approximately ten days later Kemper received a telegram from McGarrity stating

that he "had a car." Kemper, together with one Frank Harper, left for Brownwood. Upon arrival there, McGarrity took Kemper to meet the appellant Van Huss. On the way to Van Huss' place McGarrity and Kemper discussed what would be the "best thing" to tell appellant and it was decided to tell him that Kemper wanted to buy the junked automobiles for building "hot rods" in California, because they did not know whether Van Huss "would give us the titles at that time." But, when during the conversation, it was found that Van Huss "didn't care what they were used for" Kemper told him that he "didn't want the motors or frames" that all he wanted "was the numbers cut out of the frames," which he would "insert" in other automobiles and sell them. Kemper did not have enough money to buy the title of the car McGarrity had wired about, but gave Van Huss $30.00 to close the deal.

After returning to Carlsbad, Kemper took Clark Kelting, another of the named conspirators, into his confidence, and told him that he did not have the money to purchase the titles. Kelting raised $400.00 and Kemper raised $350.00, and the two of them went to Brownwood. Van Huss met McGarrity and Kemper in a cafe and Kemper purchased the titles of two 1949 Fords at $300.00 each. Kemper and Kelting returned to Carlsbad with the titles. About three weeks later, one Sigler who had been taken into the "organization" and Kelting, went to Odessa, Texas, and "picked up" the first stolen car. Title on the stolen car was changed by Kemper and it was sold in Carlsbad.

To allay suspicion, the "organization" rented a house nine miles out of Taos, and moved their point of operation there. On two different occasions, when neither Kemper nor Kelting could make the trip to Brownwood for titles, the appellant personally delivered them to Kemper in Taos. On such occasions he observed the garage where Kemper maintained the necessary tools for grinding the numbers off the stolen cars. After receiving titles, license plates and serial tags from Van Huss, members of the "organization" would start out to find a car corresponding in make, model and style with the wrecked or junked

122

car. After the car was found and stolen, it would be driven to some "secret spot"; the license tag of the junked car would be substituted for the one on the stolen car, and it would then be driven to Taos where Kemper would complete the job of obliterating all marks of title and substituting therefor incidents of title furnished by Van Huss. Thereafter the car would be sold. Members of the "organization" charged with stealing the cars, on a few occasions encountered difficulty in "wiring around" the ignition to get them started. On one occasion this was called to the attention of Van Huss, and he "proceeded to show them how."

In the early part of March, 1951, Kemper received a telephone call to the effect that the police were checking some of the titles on cars the "organization" had sold. He left immediately for Brownwood to contact McGarrity and Van Huss. It was late night when he arrived but he went to the appellant's home and "woke him and his wife up." He wanted to be sure that the appellant's books had been brought up to date so "there wouldn't be a discrepancy in the amount of titles or cars they had supposedly sold." Kemper was advised by the appellant "that if the National Automobile Theft Bureau, or the F.B.I. contacted him," he would tell them that Kemper was one of the "best car buyers in the country and we would try to stick by that."

From July 3, 1950, when Kemper made his first trip to Brownwood for the purpose of finding a source of titles, until March 11, 1951, when the "organization" ceased operations because of police investigation, fifty-eight cars were stolen and sold under indicia of title, furnished by Van Huss, and for which he received between $18,000 and $20,000.

■ We think this evidence warranted the inference that appellant not only had knowledge of the conspiracy but that he cooperated in a manner to become an essential part of it.

The judgment is affirmed.