Saul Laurence WELLMAN, Nathan Kaplan, a/k/a Nat Ganley, Thomas De Witt Dennis, Jr., Philip Schatz, Helen Mary Winter, and William Allan, Appellants,

v.

UNITED STATES of America, Appellees.

No. 12237.

United States Court of Appeals Sixth Circuit.

Nov. 18, 1955.

---

Ernest Goodman, Detroit, Mich., George W. Crockett, Jr., Goodman, Crockett, Eden & Robb, Detroit, Mich., on brief, for appellants.

William G. Hundley, Department of Justice, Washington, D. C., Fred W. Kaess, U. S. Atty., Detroit, Mich., John J. Keating, Jr., Lawrence K. Bailey, Dept. of Justice, Washington, D. C., on brief, for appellee.

Before McALLISTER, MILLER and STEWART, Circuit Judges.

MILLER, Circuit Judge.

Following a trial by jury, which commenced on October 29, 1953 and ended on February 19, 1954, the appellants were convicted of conspiring to violate the Smith Act, which prohibits the advocacy of the overthrow of the Government of the United States by force or violence. Secs. 2385 and 371, Title 18, U.S.Code. Each received a sentence of a fine of

$10,000 and imprisonment ranging from four to five years.

The Smith Act, enacted June 28, 1940, 54 Stat. 670, defined the substantive offenses in Section 2, Title I, and by Section 3 thereof made it unlawful for any person to conspire to commit any of the acts so prohibited. This was carried in the 1940 edition of the U.S.Code as Title 18, Sections 10 and 11. In the 1948 revision of the Federal Criminal Code the wording of the substantive offenses was changed in some respects, not material to this case, and the conspiracy provision contained in Section 3 of the original Act was omitted. The offense of conspiring to violate the provisions of the Smith Act is covered by the general conspiracy statute, Section 371, Title 18, U.S.Code. The revised wording of the Smith Act is carried as Section 2385, Title 18, U.S. Code, 1948 Edition, and reads as follows:

"Whoever knowingly or willfully advocates, abets, advises, or teaches the duty, necessity, desirability, or propriety of overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof or the government of any political subdivision therein, by force or violence, or by the assassination of any officer of any such government; or

"Whoever, with intent to cause the overthrow or destruction of any such government, prints, publishes, edits, issues, circulates, sells, distributes, or publicly displays any written or printed matter advocating, advising, or teaching the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or attempts to do so; or

"Whoever organizes or helps or tempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction."

The indictment refers to Sections 2 and 3 of the Act as originally drafted and to Sections 371 and 2385 of Title 18, U.S. Code as being the applicable law during the respective periods of their existence.

The indictment consisting of a single count was returned on September 22, 1952. It charged that from on or about April 1, 1945 and continuously thereafter up to and including the date of the filing of the indictment, the appellants conspired in Michigan and elsewhere with other named conspirators, not defendants herein, and with other persons to the Grand Jury unknown, to violate the Smith Act by (1) wilfully advocating and teaching the duty and necessity of overthrowing the Government of the United States by force and violence, with the intent of causing said overthrow as speedily as circumstances would permit, and by (2) wilfully organizing and helping to organize as the Communist Party of the United States a society, group, and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence with the intent of causing said overthrow as speedily as circumstances would permit.

The indictment also alleged that it was part of said conspiracy that the appellants and their co-conspirators would become members and officers of the Communist Party, knowing its purposes, and assume leadership in the Party; that they would cause to be organized groups and various units of the Communist Party and would recruit members therein, concentrating activity in basic industries and plants; that they would publish and circulate books and articles,

issue directives and conduct schools and classes, teaching and advocating the duty and necessity of overthrowing the Government of the United States by force and violence as speedily as circumstances would permit; that they would agree upon and carry into effect detailed plans to go underground in event of emergency and from said underground positions continue the conspiracy; and that they would use false names and documents in order to conceal their identities and activities as members of said Communist Party. The indictment set out overt acts detailing meetings held in Detroit, Michigan and the issuance and circulation of an article on Marxism-Leninism and directives of the Communist Party of Michigan. Motions by appellants to dismiss the indictment and for judgments of acquittal made at the close of the Government's evidence and at the close of all the evidence were overruled by the trial judge.

` The following history of the Communist movement and of the Communist Party, as shown by the evidence, is necessary to correctly understand appellants' position on this appeal. For some time prior to January 20, 1944 Earl Browder was the National Secretary of the Communist Party of the United States, which based its political philosophy on the teaching of socialism and political economy embodied in the works of Karl Marx, Friedrich Engels, V. I. Lenin and Joseph Stalin. The Communist Party for approximately 20 years had proposed candidates for national and local public office. Following the Teheran agreement in 1943 between the President of the United States, the Prime Minister of Great Britain, and the Premier of the Soviet Union, which Browder interpreted as foreshadowing an indefinite period of all class peaceful collaboration for a long term of years, Browder proposed that the Communist Party of the United States should cease to function as a political party and should be organized as a political association, which, while continuing to educate the working masses concerning socialism

and pressing for political action on their social and economic problems, would no longer propose candidates for public office. He anticipated a willingness on the part of capital to grant labor a more equitable share of the national economy and to collaborate with labor in achieving the national unity necessary to carry out the decisions of the Teheran conference in a democratic and progressive spirit. The Communist Party's President, William Z. Foster, opposed Browder's proposal. However, at the national convention of the Communist Party held in May 1944, the convention approved Browder's recommendation, voted the dissolution of the Communist Party of the United States and formed the Communist Political Association of the United States.

In April 1945, Jacques Duclos, an official of the Communist Party of France, publicly criticised Browder's position and his perspective of post-war collaboration between Labor and Capital and expressed the view that Communist Parties of most countries had not approved Browder's position. This caused considerable discussion and expression of opinion by the leadership and membership of the Communist Political Association, generally approving the views of Foster and Duclos. At the Convention of the Communist Political Association held in New York on July 26–28, 1945, the dissolution of the Association was voted. It then reconvened as the reconstituted Communist Party of the United States and adopted a constitution. Appellants Ganley, Wellman and Winter attended this 1945 convention.

The preamble of the Constitution stated that the Communist Party of the United States was the political party of the American working class, basing itself upon the principles of scientific socialism, Marxism-Leninism, and that "The Communist Party recognizes that the final abolition of exploitation and repression of economic crises and unemployment, reaction and war, will be achieved only by the socialist reorganization of society— by the common ownership and operation of a national economy under a govern-

ment of the people led by the working class," and "The Communist Party, therefore, educates the working class in the course of its day to day struggles, for its historic mission, the establishment of socialism." Article IX, Section 2 of the Party's Constitution read—"Adherents to or participation in the activities of any clique, group, circle, faction or party which conspires or acts to subvert, undermine, weaken or overthrow any or all institutions of American democracy, whereby the majority of the American people can maintain their right to determine their destinies in any degree, shall be punished by immediate expulsion."

The main question involved in this appeal is the interpretation to be placed upon the documents and events associated with the dissolution of the Communist Political Association and the reconstitution of the Communist Party in 1945. The Government presented its case through the testimony of nine witnesses, who included former members of the Communist Party who had broken with it and persons who had joined the Communist Party to act as undercover agents, and by documentary evidence showing the philosophy and purposes of the Party. It showed the organizational setup of the Communist Party and its operations, the literature and documents issued or circulated, what had been taught and said at schools and conferences conducted by the Party, or claimed affiliates of that organization, with respect to the meaning of Marxism-Leninism, and the interpretation to be given various passages appearing in books and pamphlets circulated by the Communist Party of the United States and the Communist Party of Michigan. It introduced as exhibits numerous books, pamphlets and documents identified as having been issued, circulated or used by the Communist Party, and read to the jury extensive excerpts from them. This documentary evidence included Marx and Engels' "The Communist Manifesto," Lenin's "State and Revolution," Stalin's "Foundations of Leninism," and "Problems of Leninism," J. Peters' "Commu-

nist Party—A manual on Organization," "Outline on Fundamentals of Marxism for Class Use or Self Study," "Program of the Communist International," "Strategy and Tactics of the Proletarian Revolution," "Theory of the Proletarian Revolution" and "History of the Communist Party of the Soviet Union." The Government claimed that such books, together with the literature and teaching of the Communist Party, should be interpreted as advocating the violent overthrow of the Government. All of the appellants, with the exception of Ellen Winter, testified for the defense. They did not deny that they were members of the Communist Party or that the Party taught the Marxist-Leninist doctrines as shown by the Government's documentary evidence. In fact they relied upon much of such evidence introduced by the prosecution. They denied that they or the Communist Party at any time within the indictment period, or prior to 1945, taught or advocated, or that the Communist Party existed for the purpose of teaching and advocating the overthrow of the Government by force or violence. They introduced much additional documentary evidence, including such publications as William Z. Foster's "History of the Communist Party of the United States," Engles' "The Origin of the Family, Private Property and the State," Eugene Varga's "Two Systems," James S. Allen's "Negro Liberation," "Lenin's Selected Works," Lenin's and Stalin's "Marxism and Revisionism," "Marx-Engels Marxism," "Theory of the Proletarian Revolution," and "Class Outline, Principles of Marxism." They contend that the books and literature introduced in evidence, and what had been taught and said at schools and conferences conducted by the Communist Party, when correctly interpreted did not advocate the violent overthrow of the Government.

There have been a number of cases involving the Smith Act since its enactment in 1940. The following six opinions of five different Courts of Appeals and the opinion of the Supreme Court in one of them, in which a limited writ of cer-

tiorari was granted, discuss many of the questions usually involved in such prosecutions. Dunne v. United States, 8 Cir., 138 F.2d 137, certiorari denied, 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476; United States v. Dennis, 2 Cir., 183 F. 2d 201, affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Frankfeld v. United States, 4 Cir., 198 F.2d 679, certiorari denied, 344 U.S. 922, 73 S.Ct. 389, 97 L. Ed. 710; United States v. Flynn, 2 Cir., 216 F.2d 354, certiorari denied, 348 U.S. 909, 75 S.Ct. 295, rehearing denied 348 U.S. 956, 75 S.Ct. 285; Yates v. United States, 9 Cir., 225 F.2d 146, certiorari granted, 350 U.S. 860, 76 S.Ct. 104; United States v. Mesarosh, 3 Cir., 223 F.2d 449. See also: United States v. Schneiderman, D.C.S.D.Cal., 106 F.Supp. 892 and 906. The present appeal for the most part involves these same issues, which counsel urges upon us with considerable vigor.

■ The constitutionality of the Smith Act was upheld by the Supreme Court in Dennis v. United States, supra, insofar as it applied to the situation therein involved. The defendants contended in that case that the statute deprived them of the right of free speech as guaranteed by the First Amendment to the Constitution of the United States. In rejecting this contention the Court of Appeals and the Supreme Court in their respective opinions discussed at considerable length the numerous Supreme Court decisions involving the rule that a criminal conviction relying upon speech or press as evidence of violation of a statute may be sustained when, and only when, the speech or publication creates a "clear and present danger" of a serious, substantive evil that Congress has a right to prevent. It is unnecessary to review them here. It is sufficient to point out that the Court ruled that in evaluating the conflict between the right of free speech under the First Amendment and the interest of the Government in preventing its overthrow by force and violence, Congress had the right to limit freedom of speech where the utterances found to be in violation of the statute were made under such circumstances as to present a clear and present danger of a serious, substantive evil to the continued existence of the Government. As stated by Judge Learned Hand in the opinion of the Court of Appeals, and approved by the Supreme Court: "In each case they [the Courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." It further held that it was for the Court, rather than the jury, to determine the existence of a clear and present danger. In that case its existence was found not only by the trial judge but also by the Court of Appeals and the Supreme Court on their respective reviews.

■ Appellants nevertheless contend that under the clear and present danger rule the Smith Act cannot constitutionally be applied to them in the present case, because (1) they are not in the top-policy making and supervisory group in a nation-wide organization as were the defendants in the Dennis case; (2) "the context of world crisis" [341 U. S. 494, 71 S.Ct. 867] in 1948, which the Court relied on to sustain the convictions in the Dennis case, had changed by 1952 so that a "world crisis" no longer existed; and (3) the effect of the Dennis decision on civil liberties has been so destructive that a judicial balancing would require a determination that the Smith Act could not be constitutionally applied to these appellants.

We think that the first two of these alleged distinctions are not really distinctions, but merely present questions of degree. The present case involves the same conspiracy, although covering a different period of time, as was involved in the Dennis case. These appellants, although not the top leaders of the Communist Party, were nevertheless leaders of the party in close collaboration with the defendants in the Dennis case. The War in Korea had not ended by September 22, 1952, the date of the present indictment. As said by the Court in United States v. Flynn, supra, 216 F.2d at

page 366: "Where a conspiracy to destroy the Government by force or violence is involved, we think that the 'clear and present danger' concept, as defined in Dennis, 183 F.2d at page 212, 341 U.S. at page 510, 71 S.Ct. at pages 867, 868, connotes no more than that the setting in which the defendants have conspired is such as to lead reasonably to the conclusion that their teachings may result in an attempt at overthrow", and as pointed out, 216 F.2d at page 367—"And if the danger was clear and present in 1948, it can hardly be thought to have been less in 1951, when the Korean conflict was raging and our relations with the Communist world had moved from cold to hot war." In rejecting a similar contention in United States v. Dennis, supra, 183 F.2d 201, at page 213, the Court said: "When does the conspiracy become a 'present danger'? The jury has found that the conspirators will strike as soon as success seems possible, and obviously, no one in his senses would strike sooner. Meanwhile they claim the constitutional privilege of going on indoctrinating their pupils, preparing increasing numbers to pledge themselves to the crusade, and awaiting the moment when we may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that the chance seems worth trying. That position presupposes that the Amendment assures them freedom for all preparatory steps and in the end the choice of initiative, dependent upon that moment when they believe us, who must await the blow, to be worse prepared to receive it."

With respect to the third alleged distinction, if the requirements of the clear and present danger doctrine are met in the present case, we believe it is immaterial that the ruling cuts across the civil liberties relied upon by the appellants. Such liberties have not been destroyed or struck from our Constitution as claimed by the appellants. In a case of this nature they clash with and must yield to an opposing and more powerful, fundamental principle of our national government.

In our opinion, the conspiracy alleged in the present indictment and found by the jury to exist created a clear and present danger of an attempt to overthrow the Government by force and violence, and the statute was constitutionally applied to these appellants.

Appellants claim that it was prejudicial error for the Trial Judge not to receive offered testimony from a professor of Yale University and a member of the American Civil Liberties Union on the issue of the "clear and present danger". These witnesses would have testified about the deterioration of civil liberties in the United States and the relationship between this deterioration and the decision upholding the Smith Act as constitutional. Appellants claim that this issue was, as is every other element of the offense, one that should be submitted to the judicial process and was a matter for litigation. The Trial Judge was of the opinion that the issue was a question of fact for him to decide and that the opinion of the two college professors "coming in here and trying to tell me how we are losing our rights" would not help him in deciding that fact.

■ The Supreme Court held in Dennis v. United States, supra, 341 U.S. at page 513, 71 S.Ct. at page 869, that the doctrine that there must be a clear and present danger of a substantive evil that Congress has a right to prevent is a judicial rule to be applied as a matter of law by the courts, and that whether the First Amendment protects the activity which constitutes the violation of the statute must depend upon a judicial determination of the scope of the First Amendment applied to the circumstances of the case. This requires in a case like the present one a consideration of world conditions, including the nature of the Communist Party, the activities of its leaders, uprisings in other countries, and the international relationships of the United States, Dennis v. United States, supra, 341 U.S. at pages 510–511, 71 S.Ct. at pages 867–868, matters of which the Court can and should take judicial notice. While facts are necessarily the

basis of such a determination by the Court, they are not facts which must be established by witnesses in a hearing held for that purpose. Nor is the Court bound by the opinion testimony of witnesses who evaluate world conditions differently from the overall evaluation put upon them by the Court. We are of the opinion that the offered testimony was not material to the factual situation being considered by the Court and was properly excluded. United States v. Mesarosh, supra, 223 F.2d at page 456.

Appellants contend that so much of the indictment as charged a conspiracy to organize the Communist Party was outlawed by the applicable three-year statute of limitations, Sec. 3282, Title 18, U.S.Code. They point out that the Communist Party of the United States came into being at the convention in New York in July, 1945 when the Communist Political Association was dissolved and the Communist Party reconstituted and its constitution adopted; and that it was fully organized prior to September 22, 1949, three years prior to the return of the indictment. The District Judge rejected this contention and instructed the jury: " * * * every step wilfully and knowingly taken by these defendants between September 22, 1949 and September 22, 1952 to promote the objectives of the Communist Party of the United States, including the organizing of any club, unit, or division, regrouping, expansion of existing clubs, prompting or holding classes, giving speeches, distributing leaflets or literature, teaching the Marxism-Leninism brand of Socialism was 'organizing' or 'helping to organize' the Communist Party within the meaning of the statute."

In five District Court trials involving this issue, appellants' contention has been sustained in United States v. Flynn, S.D.N.Y. and United States v. Mesarosh, W.D.Pa., and rejected in United States v. Schneiderman, S.D.Cal., United States v. Huff, W.D.Wash., and United States v. Fujimoto, D.C.Hawaii, all cases unreported.

If the word "organize" is given its restricted meaning of bringing an organization into being and endowing it with organs with which to function, such as creating a corporation or a school district, appellants' contention would be well taken. Sebastian-Lathe Co. v. Johnson, D.C.S.D.N.Y., 110 F.Supp. 245, 246; Roosevelt v. Hamblin, 199 Mass. 127, 85 N.E. 98, 18 L.R.A.,N.S., 748; City of Beaumont v. City of Beaumont Independent School Dist., Tex.Civ.App., 164 S.W.2d 753, 756. But, as defined in Webster's New International Dictionary, Second Edition, it also has the generally accepted meaning of "To arrange or constitute in interdependent parts, each having a special function, act, office, or relation with respect to the whole; to systematize; to get into working order; as, to organize an army; to *organize recruits*" (emphasis added). See: Weir v. United States, 7 Cir., 92 F.2d 634, 638.

■ The Smith Act clearly does not use the phrase "organizes or helps * * * to organize" in the sense of creating any corporate entity or similar organization. On the contrary, it prohibits the organization of "any society, group, or assembly of persons" who teach and advocate the overthrow of the government by force or violence. Giving due consideration to the purpose of such legislation, it seems clear that it was not aimed at merely the initial meeting of such a group, but was also meant to prevent the expansion, growth and perfection of such an organization through the recruiting of new members, the training of such new members in the principles of the organization, and by making the necessary arrangements or changes from time to time to ultimately produce the kind of an organization necessary to accomplish its objectives. This is in accord with the view taken by the Court of Appeals for the Ninth Circuit in Yates v. United States, supra, decided after this appeal was argued and submitted. We think the ruling of the District Judge was correct on this phase of the case.

The Government introduced considerable evidence dealing with the activities and teachings of the Communist Party prior to 1944 through testimony of former members of the Party, principally Lautner and Nowell. Lautner joined the Party in 1929 and continued as a member until he was expelled .in January, 1950 as an F.B.I. spy. He held various positions in the organization, had attended schools conducted by the Party at which he claimed that he was taught that socialism in the United States could only be achieved by a violent revolution, and had himself taught at various Communist Party Schools and conferences. In addition to introducing through him some of the Government's documentary evidence, he testified as an expert witness about the teaching and advocacy of the Communist Party in the pre-1944 period. He stated as his opinion the Preamble to the Party's 1945 Constitution, basing the Party upon the principles of Marxism-Leninism was a dedication to the advocacy of the forcible overthrow of the Government.

The witness Nowell was a member of the Communist Party at Detroit from 1929 to 1936, holding various positions with the organization. He attended the Lenin Institute in the Soviet Union in 1931, at which he testified he was taught the "science of civil warfare," which included the taking of the President of the United States and his Cabinet as hostages. He introduced some of the Government's documentary evidence, and testified that he was taught that the government of the United Staes should be overthrown by force.

Such evidence was offered by the Government and received by the Trial Court on the theory that the reconstitution of the Communist Party in 1945 was a return to the principles of Marxism-Leninism which had been abandoned during the 1944–1945 Browder period of the Communist Political Association, and that proof of alleged Communist teachings of the violent overthrow of the government in the pre-1944 period was competent as "background" evidence to show the objective intended to be achieved by reconstituting the Party in 1945. The jury was instructed on repeated occasions that the evidence was for the purpose of showing what Communism was before 1944 and was not binding upon any appellant unless and until he was connected with it in some manner.

Appellants concede that some evidence of the pre-indictment period should have been admitted for the proper orientation of the jury and an understanding of the internal differences in the Party which arose in the 1944–1945 era of the Communist Political Association and culminated in the 1945 reconstitution of the Party. They contend that the Trial Court abused its discretion in permitting the introduction of such evidence to the extent that it did, which in effect converted the case into an *In rem* action against the Communist Party. Keegan v. United States, 325 U.S. 478, 480–481, 65 S.Ct. 1203, 89 L.Ed. 1745; Hall v. United States, 4 Cir., 256 F. 748.

■■ The rule is well settled that evidence of prior transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transaction under scrutiny. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1010; Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 46–47, 31 S.Ct. 502, 55 L.Ed. 619. It has particular application to an alleged conspiracy. Davis v. United States, 6 Cir., 107 F. 753, 756–757; Egan v. United States, 8 Cir., 137 F.2d 369, 381–382. The period of time within which the evidence offered to establish the guilty purpose occurred deals largely with the weight of the evidence. Spurr v. United States, 6 Cir., 87 F. 701, 711; Orloff v. United States, 6 Cir., 153 F.2d 292, 294. See: Kettenbach v. United States, 9 Cir., 202 F. 377, 384. We agree with the ruling of the Court of Appeals in United States v. Dennis, supra, 183 F.2d at page 232, that the interlude of the Communist Political As-

sociation between May 1944 and July 1945 did not render evidence of activities prior to May 1944 too remote.

The indictment charged that there was a conspiracy to organize as the Communist Party a group of persons who advocated the overthrow of the Government. The nature and objectives of the Communist Party were in issue. What the Communist Party advocated prior to 1944 had a very important bearing on this issue. The Government was entitled to fully develop this phase of the case. In permitting the Government to do so the District Judge was careful to keep the jury advised throughout its development of its "background" character. In addition, in his charge to the jury, he instructed it as follows:

"Necessarily it must be apparent to this jury that if the government was to have an opportunity to prove its case it could do so only by showing what it claimed Communism stood for before 1944 and permit the government to go back a number of years which we did, but, of course, what the Communist Party may have stood for or taught and advocated up to 1945 cannot be used to convict those accused unless it has been proven that in 1945, after temporarily abandoning force and violence as an objective, the Communist Party returned to that theory, such theory or objective continued during the period specified in the indictment, and was wilfully and knowingly adopted as their own by these defendants.

"Any participation by any of these defendants in this conspiracy, if you find a conspiracy existed, before September 22nd, 1949, so far as this case is concerned, would not render them guilty here. Evidence of all those previous years was permitted here only so the government, if it could, might prove what the Communist Party of 1944, before Browder, believed and so you would know just what the objectives of the Communist Party were in 1945 when according to the government it readopted its old theory or position. This court decided that although somewhat out of

order it would be fairer to defendants and this jury if you could have a complete picture chronologically of claimed events. You could not very well know the type of Communism to which the Party of 1945 returned as alleged by the Government, unless you also knew just what the pre-Browder type of Communism really was. That, ladies and gentlemen, was what the government elected to prove and which it says it has proved, particularly by the witnesses Nowell and Lautner who were considered by this court as experts on Communism and who were each members of the Party—Nowell from 1929 through 1936, and Lautner running back from 1929 to 1950. But—we repeat—such actions as to alleged activities of the Communist Party through its schools, or statement declarations, or other acts of its members made or occurring before the date of the Smith Act, June 29, 1940 and up to 1944—should be '45—has been admitted only to aid the jury in determining the aims, nature, character and objectives of the Communist Party as they existed up to that time and whether or not these defendants, in starting the Communist Party of the United States of America in 1945 and continuing throughout the three-year period immediately preceding the filing of this indictment on September the 22nd, 1952, had rededicated themselves to the same aims of this Party, society, group, and assembly of persons which before 1944 had taught and advocated the overthrow of the United States by force and violence with intent to cause such overthrow and destruction of this government, as speedily as circumstances would permit."

We find no abuse of discretion on the part of the District Judge in admitting the "background" evidence complained of as so limited and qualified both during the trial and by such closing instructions to the jury.

The government's evidence included testimony about statements and acts of certain persons, who were not defendants, allegedly occurring within

the indictment period. This was admitted by the Trial Court upon the theory that the person whose statement or act was being given to the jury was a co-conspirator, whose statements and acts in furtherance of the conspiracy were admissible as the statements and acts of the appellants. United States v. United States Gypsum Co., 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746, Blue v. United States, 6 Cir., 138 F.2d 351, 360. The appellants recognize this accepted principle of the law of conspiracy, but contend that in order for it to be applicable the evidence must show participation by the accused in the conspiracy with knowledge of its criminal purpose; that membership in the Communist Party without knowledge of any illegal purpose is not sufficient to make them responsible for the acts or statements of other conspirators. They rightfully protest against the application to them of the doctrine of "guilt by association." Schneiderman v. United States, 320 U.S. 118, 146–159, 63 S.Ct. 1333, 87 L.Ed. 1796; Keegan v. United States, supra; United States v. Peoni, 2 Cir., 100 F.2d 401, 403. Any application to them of such a doctrine is barred by the Internal Security Act of 1950, which provides: "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of [this Act] or of any other criminal statute." Sec. 783(f), Title 50, U.S.C.A. It is their contention that nowhere in the record is there any evidence that any of the appellants ever taught or advocated, or agreed to teach and advocate forbidden doctrine, except as they may be chargeable with the claimed teaching, advocacy or alleged understanding of other members of the Party, or their common advocacy of Marxist-Leninist classics.

In answering this contention certain other well settled principles of the law of conspiracy must be kept in mind. Declarations of a co-conspirator are admissible although he is not made a party defendant. Prichard v. United States, 6 Cir., 181 F.2d 326, 330, affirmed 339 U.S. 974, 70 S.Ct. 1029, 94 L.Ed. 1380. It is not necessary that the defendant be a party to the original agreement, or that he know all of his co-conspirators, or that he participate in carrying out the full scope of the conspiracy. If he joins the conspiracy after the formation and aids or abets it with an understanding of its purpose, he becomes a party to the conspiracy. United States v. United States Gypsum Co., supra, 333 U.S. at page 393, 68 S.Ct. 525; United States v. Mesarosh, supra, 223 F.2d at page 455; Burkhardt v. United States, 6 Cir., 13 F.2d 841, 842; Jezewski v. United States, 6 Cir., 13 F.2d 599, 602; Zottarelli v. United States, 6 Cir., 20 F.2d 795, 798, certiorari denied, 275 U.S. 571, 48 S.Ct. 159, 72 L.Ed. 432. Whether a conspiracy exists and who are parties to it usually must be proven by circumstantial evidence. American Tobacco Co. v. United States, 328 U.S. 781, 809–810, 66 S.Ct. 1125, 90 L.Ed. 1575; Davidson v. United States, 6 Cir., 274 F. 285, 287; Blackford v. United States, 10 Cir., 195 F.2d 896, 898–899; Stillman v. United States, 9 Cir., 177 F.2d 607, 615–616. Knowledge on the part of individual conspirators is a matter of inference from the facts proved. Frankfeld v. United States, supra, 198 F.2d at page 689; United States v. Anderson, 7 Cir., 101 F.2d 325, 332, certiorari denied, 307 U.S. 625, 59 S.Ct. 822, 83 L.Ed. 1502; Van Huss v. United States, 10 Cir., 197 F.2d 120; Direct Sales Co. v. United States, 319 U.S. 703, 711, 713, 63 S.Ct. 1265, 87 L.Ed. 1674.

On this phase of the case, the Trial Judge instructed the jury: "You may not infer that any particular individual was a party to or member of such conspiracy merely because the evidence shows him or her to have been a member or officer of the Communist Party. That alone is not sufficient. Under our system of law, guilt(y) of crime is a personal and individual matter and regardless of what you may find were the

principles and doctrines advocated and taught by the Party during the period of the indictment, unless the defendants knew that objective and knowingly and wilfully participated and aided in promoting it with intent to cause the overthrow of this Government by force and violence you cannot convict. * * * So the next question is whether the accused became a party to or a member of the conspiracy each with knowledge and understanding of its purpose and were wilfully active in seeking to attain its objective, known to said defendants, or any of them, to be illegal."

■ It is unnecessary to review in detail the circumstantial evidence introduced by the Government bearing on this issue. Briefly it included evidence that Ganley and Wellman were members of the convention where the constitution was adopted in New York at a closed meeting of the Communist Party; that Allan was told when he became a member of the Party in 1933 or 1934 that one of the Communist Party's purposes was to obtain its objective by force and violence, if necessary; that the appellants believed in and taught Marxism-Leninism, and taught and advocated the tenets of the Communist Manifesto and the writings of Stalin and Lenin; that the proper interpretation of such views and documents was that the Communist Party planned to gain control of the Government and taught that this objective must be accomplished through force and violence, rather than by the ballot; their long and active membership in the Communist Party before and after 1945; their attendance as delegates at state and national conventions of the Party, at times serving on committees thereof; and their active participation over a period of time in the affairs of the Party. Such evidence fully justified the submission to the jury of the issue whether the appellants were members of the alleged conspiracy and knew its purposes. United States v. Mesarosh, supra, 223 F.2d at page 452. Compare: Knauer v. United States, 328 U.S. 654, 667–668, 66 S.

Ct. 1304, 90 L.Ed. 1500. The instructions of the Trial Judge correctly explained the issue to the jury and the necessity of knowledge on the part of the appellants in order to convict.

■ Government witness Lautner was permitted to testify as an expert concerning the understanding among the "initiates" of the meaning of provisions of the Party's Constitution. Appellants argue that the prime issue which the jury was called upon to decide was whether Marxism-Leninism, as taught and advocated, or as agreed to be taught and advocated, by the Communist Party and by the appellants, included or comprehended the teaching and advocacy of the violent overthrow of the government; that Lautner's expression of opinion that opposition to overthrow of the government by force and violence was inconsistent with the principles of Marxism-Leninism and that the dictatorship of the proletariat could not be achieved peacefully invaded the province of the jury. Lautner's long membership in the Party, his training and activities, qualified him as an expert on the subject and his opinion evidence on such a subject, not of common knowledge, was admissible under the generally accepted principles governing expert witnesses. Secs. 1917–1918, Vol. III, Wigmore on Evidence, Third Edition. The objection that such testimony dealt with the same issue before the jury and usurped the functions of the jury is no more applicable to him than to any other expert witness. Such objections are generally considered of no merit. Secs. 1920–1921 Wigmore on Evidence, supra; United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546. This same contention was considered and rejected in United States v. Dennis, supra, 183 F.2d 201, 229, in Frankfeld v. United States, supra, 198 F.2d 679, 689, and in United States v. Mesarosh, supra, 223 F. 2d 449, 455.

Appellants complain of the character of the key government witnesses, who were informers, on the government pay-

roll at the time of the trial. This is largely a matter of credibility, about which the Trial Judge fully instructed the jury. Glasser v. United States, 315 U.S. 60, 77, 62 S.Ct. 457, 86 L.Ed. 680; Schneider v. United States, 3 Cir., 57 F. 2d 454, 456–457; United States v. Levy, 3 Cir., 153 F.2d 995, 997.

■ Appellants requested an instruction which would have called to the jury's attention the informer's hope of personal benefit through later employment, and urge upon us as error the Trial Court's rejection of it. We are of the opinion that the substance of this request was sufficiently contained in the following portion of the Court's charge, considered in conjunction with its entire charge on the question of credibility. "Some of the government's witnesses are former Communists now on the government payroll, who testified under oath concerning what they claim is a plot against this government. You have a right to take this fact into consideration and that they may be hostile toward the Communist Party or these particular defendants, but the mere fact that they are on the government payroll, is not of itself, sufficient for this jury to say that you will not under any circumstances believe or not believe that witness."

■ Appellants also contend that the use of certain testimony given by informers violates the Fourth and Fifth Amendments to the Constitution, in that it was obtained by government agents whose presence in Communist Party meetings was fraudulent and constituted a trespass. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; United States v. Kirschenblatt, 2 Cir., 16 F.2d 202, 203, 51 A.L.R. 416. See: McNabb v. United States, 318 U.S. 332, 339, 63 S.Ct. 608, 87 L.Ed. 819. But as stated in United States v. Dennis, supra, 183 F.2d 201, 224: "Courts have countenanced the use of informers from time immemorial; in cases of conspiracy, or in other cases when the crime consists of preparing for another crime, it is usually necessary to rely upon them or upon accomplices because the criminals will almost certainly proceed covertly. Entrapment excluded, of which there was none here, decoys and other deception are always permissible. Those decisions which, like Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L. Ed. 647, hold that an entry procured by fraud will not condone an unlawful search, depend upon the fact that the Fourth Amendment condemns 'unreasonable searches.' "

In Olmstead v. United States, 277 U. S. 438, at page 463, 48 S.Ct. 564, 72 L. Ed. 944, the Court said that Gouled v. United States carried the inhibition against unreasonable searches and seizures to the extreme limit and that its authority was not to be enlarged by implication and must be confined to the precise state of facts disclosed by the record. In affirming the conviction in that case, it said, 277 U.S. at page 468, 48 S.Ct. at page 569: "Our general experience shows that much evidence has always been receivable, although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oathbound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised themselves and joined the organizations, taken the oaths, and given themselves every appearance of active members engaged in the promotion of crime for the purpose of securing evidence. Evidence secured by such means has always been received." Compare: Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314; Id., 308 U.S. 338, 340, 60 S.Ct. 266, 84 L.Ed. 307; Goldstein v. United States, 316 U.S. 114, 121–122, 62 S.Ct. 1000, 86 L.Ed. 1312; Goldman v. United States, 316 U.S. 129, 135–136, 62 S.Ct. 993, 86 L.Ed. 1322. See also Grimm v. United States, 156 U.S. 604, 15 S.Ct. 470, 39 L.Ed. 550; Singer v. United States, 6 Cir., 208 F.2d 477. The informers' testimony was properly received in evidence.

Coming to what appears to be appellants' chief defense, it is strenuously

urged upon us that the evidence was insufficient to establish a conspiracy to teach and advocate the overthrow of the Government of the United States by force and violence. The contention is made that the evidence failed to show that such was the objective of the reconstituted Communist Party, but, on the contrary showed that such was not its objective. They concede that the various classical works on Marxism-Leninism introduced in evidence discuss various revolutionary changes in social orders, but claim that the content of each of these books, when taken and considered as related parts of an integrated theory of social life and government and historical social changes, reveals the following:

Capitalism is a system founded upon wage labor, and inevitably creates two basic competing economic classes in society, (1) those who by their labor produce all of the necessities of life (the "proletariat"), and (2) those who control the means of production (the "bourgeoise") and receive the benefit of the surplus value produced by the laboring class. So long as capitalism continues, the struggle between these competing classes must necessarily continue. The only solution is Socialism, from each according to his ability, and to each according to his needs, with common ownership of the means of production. Socialism can only come when the political consciousness of the working masses has developed to the point where they are convinced that capitalism cannot solve their problems of livelihood. The day-to-day united efforts of the working class through the avenues of the democratic processes open to them to obtain better wages and living conditions and more sympathetic representation in government inevitably will be met with opposition from the bourgeoise, which becomes increasingly intense with each beneficial change achieved by the working classes. As the struggle attracts the support of larger segments of the population, those who dictate the policies of government can be expected to use the machinery of governmental force to maintain their dominant position and thwart the will of the majority. The Marxist-Leninist classics look to a gradual non-violent termination of capitalist society with the substitution of a workers' state and the dictatorship of the proletariat, but recognize the probability that any such transition will be accompanied by force and violence, emanating, however, from the outgoing capitalist order. Should the transition be accomplished peacefully, the new proletarian order must insure its continuance by using its recently acquired state power to uproot all vestiges of the old state order and to completely abolish the state machinery of the old capitalist society. Otherwise, it is reasonable to expect that a counter revolution employing violent means will be organized by the deposed capitalist order and by force and violence attempt to regain the state power.

Appellants argue that the record in this case contains no support for a view of Marxism-Leninism which counsels a voluntary abandonment of peaceful change in favor of deliberate violence; that the books, literature, and teaching of the Party are merely expressions of political views and ideas to be made effective by the use of the ballot and other peaceful democratic processes, which are protected by the First Amendment to the Constitution; and that the case is actually a trial of books and ideas and of constitutionally protected utterances.

They urge upon us the following pronouncement of the Supreme Court in Schneiderman v. United States, supra, 320 U.S. at page 154, 63 S.Ct. at page 1351: "Political writings are often over-exaggerated polemics bearing the imprint of the period and the place in which written. Philosophies cannot generally be studied in vacuo. Meaning may be wholly distorted by lifting sentences out of context, instead of construing them as part of an organic whole Every utterance of party lead-

ers is not taken as party gospel. And we would deny our experience as men if we did not recognize that official party programs are unfortunately often opportunistic devices as much honored in the breach as in the observance." The Court pointed out in the Schneiderman case that there are sharply conflicting views on the issue of force and violence as a Party principle, that it has never passed upon the question whether the Party does so advocate, and that it was not necessary for it to do so in that case.

The Government contends on this issue that the jury found by its verdict that the appellants had an intent to cause the overthrow or destruction of the Government of the United States by force and violence as soon as circumstances would permit, and that there was competent and substantial evidence before the jury sustaining such a finding. United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 254, 60 S.Ct. 811, 84 L.Ed. 1129; Glasser v. United States, supra, 315 U.S. at page 80, 62 S.Ct. 457.

■ The following brief analysis of the Government's evidence is sufficient to show that it was amply sufficient to sustain the jury's verdict on this issue. It is unnecessary to quote at length from the documentary evidence to show that it is reasonably subject to the interpretation that Marxism-Leninism calls for the overthrow of the government by force and violence as soon as circumstances would permit. The following are a few examples.

"The Communist Manifesto" states (p. 22–23), "The immediate aim of the Communists is the same as that of all the other proletarian parties: Formation of the proletariat into a class, overthrow of bourgeois supremacy, conquest of political power by the proletariat. The theoretical conclusions of the Communists are in no way based on ideas or principles that have been invented, or discovered, by this or that would-be universal reformer. They merely express in general terms, actual relations springing from an existing class struggle, from a historical movement going on under our very eyes. The abolition of existing property relations is not at all a distinctive feature of Communism."

Lenin wrote in "State and Revolution" (p. 20) "The replacement of the bourgeois by the proletarian state is impossible without a violent revolution." Stalin wrote in "Foundations of Leninism" (p. 56) "In other words, the law of violent proletarian revolution, the law of the smashing of the bourgeois state machine as a preliminary condition for such a revolution, is an inevitable law of the revolutionary movement in the imperialist countries of the world." He also wrote in "Problems of Leninism" (p. 19–20): "Can such a radical transformation of the old bourgeois system of society be achieved without a violent revolution, without the dictatorship of the proletariat. Obviously not. * * " In "The History of the Communist Party in the Soviet Union" we read the following (p. 9): "Marx and Engels taught that it was impossible to get rid of the power of capital and to convert capitalist property into public property by peaceful means, and that the working class could achieve this only by revolutionary violence against the bourgeois, by a proletarian revolution, by establishing its own political rule—the dictatorship of the proletariat—which must crush the resistance of the exploiters and create a new classless, Communist Society." Government witnesses who had attended Party classes gave testimony to the effect that the Party did not construe the writings as a program for the peaceful acquisition of political power. Lautner testified that the teaching and advocacy of the Reconstituted Party was the same as that of the pre-1944 Party, and that the language in the Party's 1945 Constitution, upholding the achievements of American Democracy and defending the United States Constitution was "window dressing and double talk."

Appellants were top officials of the Communist Party in Michigan, had been engaged in Party activities over a long period of time, and worked in conjunc-

tion with the National Party officers. They used various devices for concealing their activities and real objectives. As said in Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154: "Secrecy and concealment are essential features of successful conspiracy." Party classes and training schools taught that the government will not collapse of its own power but must be seized by the workers through a resort to force and violence. The Party concentrated its recruiting and organizational activities among workers in the mass production industries. In its organization activities it applied the principles of democratic centralism which looked to rigid and strict control of the membership from the top.

■ The Supreme Court in Dennis v. United States, supra, 341 U.S. at page 511, 71 S.Ct. at page 868, pointed out that under the First Amendment the mere teaching and advocacy of the forbidden doctrine does not by itself constitute the crime, but that to be punishable the teaching and advocacy must be "by language reasonably and ordinarily calculated to incite persons to such action." See: Chaplinsky v. State of New Hampshire, 315 U.S. 568, 573–574, 62 S.Ct. 766, 86 L.Ed. 1031. The Trial Judge so instructed the jury. Appellants contend that there was no evidence showing that their advocacy partook of the character of incitement. We do not agree. An overall consideration of the activities of the Communist Party and its teachings to its members in secret Party schools strongly supports the reasonable conclusion that the Party was not conducting "a seminar in political theory," but that the principles of Marxism-Leninism were being taught as a guide to action which was expected to follow at a later propitious time. See concurring opinion of Justice Frankfurter, in Dennis v. United States, supra, 341 U.S. at pages 545–546, 71 S.Ct. 857.

The indictment charged a conspiracy to both teach and advocate the overthrow of the government by force and violence and to organize a group of people as the Communist Party who so taught and advocated. The Trial Judge instructed the jury that it was necessary for the Government to prove and for the jury to find *both* a conspiracy to teach and advocate *and* a conspiracy to organize.

Appellants took the position throughout the trial, as they do on this review, that it was necessary for the Government to prove the charge of conspiring to teach and advocate by evidence other than that which would prove a conspiracy to organize. They offered an instruction which charged the jury that it was necessary to prove that the appellants themselves, apart from the Communist Party, conspired to teach the doctrine through other means, which the Trial Judge failed to give as requested. He agreed with the Government's theory of the case that the same evidence which proved a conspiracy to organize the Communist Party could be used by the jury in determining whether the appellants themselves, apart from the Communist Party, conspired to teach and advocate. Appellants rely upon the ruling as prejudicial error, claiming that although there was evidence that they, as officers and members of the Communist Party, agreed to teach and advocate Marxism-Leninism, there was no evidence that the appellants, apart from the Party, taught or advocated the overthrow of the government by force or violence. In support of their contention they point out that the Smith Act treats as separate, distinct offenses, by setting them out in different paragraphs of the statute, the act of teaching and advocating and the act of organizing a group of persons who so teach and advocate.

■ We do not agree with appellants' contention. The offense of organizing may be a different offense from that of teaching and advocating. But we see no valid objection to allowing the jury to consider the evidence before it in determining both of the issues, if such evidence is relevant and has probative value on both issues. It was the

Government's contention that the appellants had certain views and objectives and conspired to make them effective through the organization and activities of the Communist Party. Proof of organization of and leadership in the Communist Party requires evidence in addition to that which would be required to prove individual and personal advocacy of the prohibited activity, but evidence used to prove the organization of the Party does not have to be restricted to that issue, nor does it lose its force or effectiveness on another issue, merely because of such use. We recognize that the holding of office or membership in the Communist Party will not constitute per se a violation of the statute. Sec. 783(f), Title 50, U.S.C.A. But the holding of office and active participation in the leadership and activities of the Communist Party can be considered by the jury on the issue of whether the appellants conspired to teach and advocate the overthrow of the government by force and violence. The jury was entitled to draw all reasonable inferences from the evidence before it in determining that issue. The issue was properly submitted to the jury under appropriate instructions.

The Supreme Court held in Dennis v. United States, supra, 341 U.S. at page 499, 71 S.Ct. 857, that the Smith Act requires as an essential element of the crime proof of the intent of those who are charged with its violation to overthrow the Government by force and violence. They argue that the case also holds that in order to obviate the constitutional infirmity of a vague and indefinite standard of guilt, such intent must be actual on the part of the particular defendant, which can be determined only from his own acts and declarations or those of others which he has specifically authorized or ratified. They contend that the Trial Judge erred in authorizing the jury to infer such intent from acts and declarations of third parties which were not shown to have been either authorized by the particular appellant or known to or ratified by him. A portion of the Court's instructions to the jury is relied upon which authorized the jury to consider statements and declarations made during the existence of the conspiracy by other members of the conspiracy as if made by any appellant who was a member of the conspiracy.

■■■ We do not give to the opinion of the Supreme Court in Dennis v. United States, supra, the broad interpretation urged upon us by appellants. We construe it as holding, 341 U.S. at page 515, 71 S.Ct. at page 870, that the constitutional infirmity of a vague and indefinite standard of guilt is obviated by the application of the "'clear and present danger'" standard. While the Court held that intent was a necessary element of the crime, it indicated, 341 U.S. at pages 499–500, 71 S.Ct. at page 862, that such intent could be inferred from the facts and circumstances of the case as in other criminal cases where intent is an issue. Among other things, the Court said: "Certainly those who recruit and combine for the purpose of advocating overthrow intend to bring about that overthrow." We do not think a conspiracy to violate the Smith Act calls for a different rule of evidence than is generally recognized and used in conspiracies to violate other offenses against the United States, United States v. Flynn, supra, 216 F.2d at page 360. In the usual conspiracy case, "Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective." Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489; Wiborg v. United States, 163 U.S. 632, 657–658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289. In his concurring opinion in Dennis v. United States, 339 U.S. 162, at page 174, 70 S.Ct. 519, at page 524, 94 L.Ed. 734, Justice Jackson expressed the view: "Courts should give to a Communist every right and advantage that they give to any defendant. But it is inconceivable that being a Communist can entitle a defendant to more."

■ The Trial Judge carefully instructed the jury on the question of intent, including such statements as: "The final element which must have been proved by the government beyond a reasonable doubt is wilful intent on the part of each of these defendants to commit the wrong specified in the indictment. * * *" and "It must also appear beyond a reasonable doubt from the evidence in this case that such defendants had by their acts or statements, the further specific wilful intent to cause or bring about the overthrow and destruction of the government of the United States by force and violence as speedily as circumstances would permit." He defined the word "wilfully" as meaning "an act done voluntarily and purposely and with the specific intent to do that which the law forbids." We find no prejudicial error in the Trial Judge's instructions on this issue.

Appellants' final contention is that they were deprived of a fair trial in violation of the Fifth and Sixth Amendments because the climate of prejudicial opinion and passion made trial by an impartial jury impossible. Motions for continuance or mistrial, made at the start and thereafter during the trial directed the Court's attention to Detroit newspaper publicity where the trial was held, radio broadcasts and motion pictures on communism, showing a strong community atmosphere of hostility against the appellants and the Communist Party, and to the State of the Union Message of the President of the United States on January 27, 1954, in which he said in referring to the subversive character of the Communist Party in the United States that we were dealing with actions akin to treason. The motions were overruled by the Trial Judge.

■ Similar motions were considered and overruled by the Court of Appeals in United States v. Dennis, supra, 183 F.2d at page 226, United States v. Flynn, supra, 216 F.2d at pages 373–378, and United States v. Mesarosh, supra, 223 F.2d at page 455. See also:

United States v. Foster, D.C.S.D.N.Y., 81 F.Supp. 281, 283. As there pointed out it was not a question of local prejudice which could be cured by removal to another district, or a question of temporary prejudice which could reasonably be expected to fade over a period of time. The choice was between using the best means available to secure an impartial jury or let the prosecution lapse. Those who have committed a crime cannot secure immunity because it is possible the jurors who try them may not be exempt from the general feelings prevalent in the society in which they live. Compare: Shushan v. United States, 5 Cir., 117 F.2d 110, 116, 133 A.L.R. 1040, certiorari denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L. Ed. 1531, rehearing denied, 314 U.S. 706, 62 S.Ct. 53, 86 L.Ed. 564; Robinson v. United States, 76 U.S.App.D.C. 29, 128 F.2d 322, 323; United States v. Von Clemm, 2 Cir., 136 F.2d 968, 971, certiorari denied, 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459. Every effort should be made to impress upon the jury the necessity of giving such defendants a fair and impartial trial, based on the evidence, and divorced from newspaper publicity and anything read or heard other than the exhibits and testimony received and given in the court room. We think that the careful and repeated instructions of the Trial Judge in this case, as in those cases, to that effect was, under the circumstances, a compliance with the due process requirement of the Constitution which appellants invoke. Compare: Stephan v. United States, 6 Cir., 133 F.2d 87, 99.

The Trial Judge overruled a motion filed on behalf of appellant Winter for continuance or severance, supported by her affidavit of physical disability, diagnosed by her physician as phlebitis of the leg. She was in considerable pain during the trial, which became so acute near the end of the trial as to cause an adjournment for several days. A Court-appointed physician, who was a specialist in vascular diseases, examined her. He reported that he found no evidence of

**776**

phlebitis, but thought it was a sciatic neuritis, which would cause her some distress and discomfort to walk, although it could be done without danger to life or without damage to the patient. He expressed the opinion that the pain she described was disagreeable and bothersome but was not agonizing or of intense severity. There was no medical testimony offered to the contrary and the trial was resumed. Appellant continued in attendance. The pain continued, but an attempt was made to ease it by propping her leg upon a stack of books. It is claimed that her inability to prepare for trial and to actively participate in her defense constituted a denial of her constitutional right to a fair trial.

■■ A denial of severance in a criminal case is within the discretion of the trial judge. Stilson v. United States, 250 U.S. 583, 585, 40 S.Ct. 28, 63 L.Ed. 1154. A motion for continuance is likewise directed to the discretion of the trial judge, subject to review only for abuse thereof. Hawkins v. Borthwick, 6 Cir., 5 F.2d 564, 566; Isaacs v. United States, 159 U.S. 487, 489, 16 S.Ct. 51, 40 L.Ed. 229; Newton v. United States, 4 Cir., 162 F.2d 795, 797. In our opinion there was no abuse of discretion in denying the severance or refusing a continuance in the present case. Clement v. United States, 8 Cir., 149 F. 305, certiorari denied, 206 U.S. 562, 27 S.Ct. 795, 51 L.Ed. 1189; Vause v. United States, 2 Cir., 53 F.2d 346, 354, certiorari denied, 284 U.S. 661, 52 S.Ct. 37, 76 L.Ed. 560; La Feber v. United States, 8 Cir., 59 F.2d 588, 590; Wolfle v. United States, 9 Cir., 64 F.2d 566, 567.

The appellants were afforded full opportunity to present their case to the jury. Those who were represented by counsel had thorough and able representation. The Trial Judge by his careful and thorough charge to the jury fully presented to it the issues submitted for its determination. The jury found against them on evidence which in our opinion substantially supports the verdict. The judgments are affirmed.